Daniel L. Low (SBN: 218387)
dlow@kotchen.com
Daniel Kotchen (*pro hac vice*)
dkotchen@kotchen.com
Michael von Klemperer (*pro hac vice*)
mvk@kotchen.com
KOTCHEN & LOW LLP
1745 Kalorama Road NW, Suite 101
Washington, DC 20009
Telephone:     202.841.7164
Facsimile:     202.280.1128

Michael F. Brown (*pro hac vice*)
DVG LAW PARTNER LLC
P.O. Box 645
Neenah, WI 54957
920-238-6781
920-273-6177 (fax)
mbrown@dvglawpartner.com

Attorneys for Plaintiff
CHERYL FILLEKES &
OPT-IN PLAINTIFFS

Dow W. Patten, Esq. (SBN: 135931)
SMITH PATTEN
221 Main Street, Suite 740
San Francisco, California 94105
Telephone (415) 402-0084
Facsimile (415) 520-0104

Attorney for Plaintiff
ROBERT HEATH

## UNITED STATES DISTRICT COURT

## THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT HEATH, on behalf of himself<br><br>and<br><br>CHERYL FILLEKES, on behalf of herself and others similarly situated,<br><br>          Plaintiffs,<br><br>          v.<br><br>GOOGLE INC., a Delaware corporation,<br><br>          Defendant. | Case No. 15-cv-01824-BLF<br><br>**SECOND AMENDED COMPLAINT**<br><br>**FOR VIOLATIONS OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT AND**<br>**THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT**<br><br>**COLLECTIVE ACTION**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.      Plaintiff Robert Heath ("Mr. Heath"), on behalf of himself, and Plaintiff Cheryl Fillekes ("Ms. Fillekes"), on behalf of herself and all others similarly situated (collectively "Plaintiffs"), allege Defendant Google, Inc. ("Google"), through its hiring and employment practices, violated the Age Discrimination in Employment Act, as amended ("ADEA"), 29 U.S.C. § 621 *et seq.* Additionally, Plaintiffs, on behalf of themselves, allege Google violated the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12900 *et seq*.

2.      Between 2007 and 2013, Google's workforce grew from 9,500 to over 28,000 employees, yet as of 2013 its employees' median age was 29 years old.

3.      As discussed in detail below, Google's has operated, and continues to operate, under interviewing and hiring policies and practices that significantly disadvantage candidates who are 40 years of age and older. These policies and practices are intentionally discriminatory and/or have resulted in a disparate impact against older workers, even if found to be facially neutral. Google's discriminatory practices include: (1) the collection of age-related data from applicants, allowing interviewers and senior staff to estimate applicants' ages, (2) an emphasis on abstract, theoretical interview questions of the type currently taught and tested in school, which Google interviewers themselves admit favor recent graduates,  (3) the discounting of real-world experience, (4) the use of higher standards for older, more "senior" applicants than are used for younger applicants for the same positions, and (5) an emphasis on "Googleyness" or "cultural fit," effectively a euphemism for youth.  These practices result in a workforce that is grossly disproportionate to the labor market for the relevant IT services.

4.      In February 2011, Google failed to hire Mr. Heath, then age 60, despite his highly-pertinent qualifications and experience for the software engineer position for which he

interviewed, despite a Google recruiter having deemed him a "great candidate" and despite Google needing many new hires and professing "Google is embarking on its largest recruiting / hiring campaign in its history."

5.      Between 2007 and 2014, Ms. Fillekes interviewed with Google for four different positions. On each occasion, she performed well during her phone interviews and was invited to Google's offices for an in-person interview. After each in-person interview, and review by Google's hiring committee, Google failed to hire Ms. Fillekes despite her highly-pertinent qualifications and programming experience.

6.      Workforce statistics for 2016, as kept by the U.S. Department of Labor ("DOL"),[1] indicate a median age of all U.S. workers of 42.2 years old. The 2016 DOL data further indicates a median age of 40.6 years old for U.S. workers in all "Computer and mathematical occupations." The DOL data further indicates:  (a) a median age 42.4 years old for all U.S. workers who are "Computer programmers;" (b) a median age of 39.6 years old for all U.S. workers in the occupations of "Software developers, applications and systems software;" (c) a median age of 41.4 years old for all U.S. workers in the occupations of "Network and computer systems administrators;" (d) a median age of 40.9 years old for all U.S. workers in "Computer occupations, all other;" (e) a median age of 43.5 years old for U.S. workers in all "Architecture and engineering occupations;" (f) a median age of 41.0 years old for U.S. "Computer hardware engineers;" and a median age of 43.9 years old for U.S. "Engineers, all other."  Google's workforce, comprised mostly of workers under the age of 40, is grossly disproportionate to these U.S. workforce norms.

---

[1]   These statistics are maintained by the Bureau of Labor Statistics at https://www.bls.gov/cps/cpsaat11b.htm

7.      Google has publicly acknowledged on its "Diversity" webpage, "We're not where we want to be when it comes to diversity. And it is hard to address these kinds of challenges if you're not prepared to discuss them openly, and with the facts."[2] However, Google's Diversity webpage does not include age-related workforce data, despite disclosing data about other worker characteristics.

## THE PARTIES

8.      Mr. Heath is a United States citizen, born on June 28, 1950, and has been 60 years old or older at all pertinent times referenced herein. Mr. Heath currently resides in Boynton Beach, FL, formerly resided in Delray Beach, FL and has resided in Florida at all pertinent times.  Mr. Heath has exhausted his administrative remedies and complied with the statutory prerequisites of filing an ADEA complaint by filing a timely discrimination complaint against Google with the U.S. Equal Employment Opportunity Commission ("EEOC"), which was cross-filed with the California Department of Fair Employment & Housing ("DFEH"). Mr. Heath has received right to sue notices from EEOC and DFEH and has timely filed this complaint and the ADEA and FEHA claims herein.

9.      Ms. Fillekes is a United States citizen and has been 47 years old or older at all pertinent times referenced herein. Ms. Fillekes currently resides in upstate New York.  Until 2014, she resided in Austin, Texas. Ms. Fillekes has exhausted her administrative remedies and complied with the statutory prerequisites of filing an ADEA complaint by filing a timely discrimination complaint against Google with the EEOC, which was cross-filed with the DFEH. Ms. Fillekes has

---

[2]    *See*      https://web.archive.org/web/20140905062131/http://www.google.com/diversity/at-google.html (archived copy of Google's webpage titled "Diversity" as it appeared September 5, 2014).

received right-to-sue notices from the EEOC and DFEH, and has timely filed the ADEA and FEHA claims contained herein.

10.     Google is headquartered in Mountain View, California, and is an American multinational corporation with internet-related products and services involving online search, software, computing, and advertising technologies.  Google had revenues of approximately $90 billion in 2016.  At all pertinent times, Google has had 9,500 or more employees in the United States and currently employs over 72,000 employees.  Google, in its own capacity and as a joint employer with subsidiaries, affiliates and/or other entities with which it is associated or contracts, has exerted significant control over the hiring and employment decisions and actions herein. Relief is sought against Google as well as its affiliates, employees, agents, assistants, and successors.

## JURISDICTION

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 29 U.S.C § 216(b), and 29 U.S.C. § 626.

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the amount in controversy of greater than $75,000, exclusive of interest and costs, and is between citizens of different states.

13.     This Court has supplemental jurisdiction over Plaintiffs' state law claim pursuant to 28 U.S.C. § 1367 as that claim arises out of the same operative facts as Plaintiffs' other claim and, together, the form part of the same case or controversy.

14.     This Court has personal jurisdiction over the Defendant because it engages in continuous and systematic business contacts within the State of California and maintains a substantial physical presence in this State, including the operation of its corporate headquarters in Mountain View, California.

## VENUE AND INTRADISTRICT ASSIGNMENT

15.     Venue in this district is proper pursuant to 28 U.S.C. § 1391, in that Google resides in this District, and a substantial part of the events (including discriminatory hiring practices) giving rise to Plaintiffs' claims occurred in this District. Assignment in this Division is proper pursuant to Civil L.R. 3-2(c) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this Division.

## FACTUAL ALLEGATIONS

*Google's Discriminatory Policies and Practices*

16.     Google's interview and hiring policies and practices are intentionally discriminatory and/or have caused a disparate impact against applicants age 40 and older, even if the policies and practices were deemed neutral in intent with regard to age.

17.     Google's interview and hiring process operates in the following way:

18.     Applicants may apply to open positions on Google's career website by submitting their resume, cover letter, educational history, and work history to Google. Google recruiters also contact applicants directly to discuss open positions within the company. The applicant's resume is then reviewed by a Google recruiter who searches for available positions matching the applicant's skill set. If the recruiter locates a potential match, the recruiter then schedules a telephone call with the applicant to discuss the open position and the applicant's skills and experience. Applicants who pass this initial phone screen are then scheduled for a 30-45 minute technical phone interview. Applicants are scored on a scale of 1 to 4 (4 being highest), and interviewers provide written feedback concerning the questions asked, the applicant's answers, and the interviewer's assessment of those answers.

19.     Applicants who receive a sufficiently high score on their technical phone screen are invited to interview on-site with Google. Prior to the on-site interview, applicants are required to complete a form disclosing their educational background, including the start and end dates for each educational institution and degree. On-site interviews are then conducted by four to five Google employees. These employees score the candidate on four Google attributes: (1) role related knowledge; (2) general cognitive ability; (3) leadership; and (4) "Googleyness." "Googleyness" refers to a candidate's "cultural fit" at Google, which is a company with a youthful culture and a disproportionately young workforce. Interviewers then assign numerical scores on a scale of 1 to 4 (4 being highest) for each attribute evaluated. Interviewers also document the questions asked during the interview, as well as the applicant's answer, and provide feedback regarding the applicant. The interviewers also make a recommendation as to whether to hire the applicant.

20.     Interviewers' scores for each candidate are averaged, and candidates receiving an overall score of 2.7 or higher are sent to one of Google's hiring committees. (Candidates who receive an overall score of less than 2.7 are rejected). The hiring committees meet multiple times each week to discuss recent applicants and to decide whether to extend an offer of employment to these individuals. Prior to the meeting, hiring committee members receive and review the interviewers' feedback, scores, and hiring recommendation, as well as the applicant's application materials, such as his or her resume. Prior to the meeting, each member also makes an independent decision as to whether he or she recommends the applicant for hire, and these recommendations are then discussed at the meeting. The committee members discuss each applicant, with the goal of reaching a consensus on a hiring decision at the meeting. The committee then assigns a letter score to each applicant and renders a hiring decision of either "Hire," "No Hire," "Recommend Hire Conditionally," (which means the applicant can be hired so long as the recruiter can identify a

team to mentor the applicant) or "Hold" (which means more information is needed and the applicant and the hiring decision is deferred to another meeting).

21.     If the hiring committee recommends an applicant for hire, the applicant's entire package of information (including the applicant's resume, interview feedback and scores, references, proposed compensation, and details on the intended role) is presented to a team of Directors and Senior Vice Presidents who may either accept or reject the hiring recommendation before a formal offer is made to the applicant.

22.     Google's interview and hiring process is structured in such a way that older applicants (applicants age 40 and older) are placed at a disadvantage. Older applicants are disadvantaged in at least five ways.

23.     First, Google requires applicants to complete a form that includes their college and graduate school graduation dates. Applicants who fail to submit this information are requested to supplement their application packages with graduation dates prior to interviews. This allows interviewers, hiring committee members, and the executives who review offers to approximate the ages of all applicants (as young applicants will generally have more recent graduation dates compared to older applicants). As Ms. Fillekes experienced, Google requests graduation dates "so the interviewers can see how old you are."

24.     Second, Google's interviewers emphasize abstract, theoretical questions of the sort currently taught and tested in college and graduate school computer science programs. This is done despite the fact that questions of this sort have very little (if any) relation to real-world software design and related IT work. This practice places younger candidates (*i.e.*, recent graduates) at an advantage compared with older candidates (who have generally been out of school for longer). Google interviewers and hiring committee members have acknowledged this issue.

As a Google interviewer explained, for example, Google's interview questions were ███████

████████████████████████ [The applicant] is clearly far removed from this

environment. I personally succeeded at interviewing for a position at Google when I was fresh out

of grad school. If I were to be interviewed today, five years later, I'm not confident that I would

fare as well." Another stated that the applicant ████████████████████████████████

████████████████████████, and didn't blaze through them like somebody fresh out

of school might." Similarly, a hiring committee member explained that a question "we think is

easy since its often given to fresh graduates … is the kind of thing that is hard when you've been

working for long enough that such ████████████████ "

25.      Third, interviewers ignore or discount applicants' real-world experience, again, to the

disadvantage of older workers who generally have more experience than younger workers.

Interviewers regularly ask applicants no questions about their experience: ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ When older

applicants' experience is discussed, it is regularly dismissed as: "rusty," "out-of-date," "ancient,"

"outdated," "old-fashioned," "old school," "old-timey," and the like. Interviewers have noted, for

example: "Her code is very old fashioned;" "His coding skill is ok while little old fashioned;" "his

knowledge is quite old;" "He was a great guy, very smart and working hard. But his resume is too

old!;" "He is an old fashioned programmer;" "He is smart, but his programming skill was a bit out

dated;" "His experience is a bit dated;" "The candidate's discussion of testing revolved around

old-school terminology and outlook;" "I concluded that the candidate's … skills are a little rusty;" ████████████████████████████████████████ …. He did some way back when Netscape still fought with IE ('round the time Dinosaurs roamed the earth.);" "He has ancient networking experience."

26.     Fourth, even when applying to the same positions, older applicants are considered "senior," and are held to higher standards than younger applicants. These higher standards are reflected in interviewer comments. For example: ████████████████████████████ ███████████████████" "I would have expected more from someone with their amount and type of experience;" "I'd expect someone doing C-like languages for years to know that off the top of their head;" "I would have liked to see more polished and a little more discussion of alternatives from a senior candidate;" "These questions should have been trivial for someone with 20 years experience;" "I was expecting more from a senior person like him;" "I was expecting somebody with that much experience to do much better;" "For someone of that experience, the interview just didn't go well enough to put me in the hire range;" "did not do well enough for a person of his experience;" "I expect better from someone with that amount of industry experience;" "Were he only 4 years out, I'd be more enthusiastic … he seemed a little bit rusty." Similarly, older candidates may be excluded entirely from lower level positions that they are interested in and qualified for. For example, one of Ms. Fillekes' interviewers noted that she would only be considered for job level 5 positions and above: "Caveat: very senior candidate, would have to be L5+." Thus, to the extent Google considers experience, it does so to the disadvantage of older applicants.

27.     Fifth, Google's emphasis on "Googleyness" and "cultural fit" further disadvantages older applicants. Interviewers, most of whom are under 40, regularly find older applicants

insufficiently "Googley" and award them lower Googleyness scores compared to younger applicants. Older applicants are frequently described as not a good "cultural fit."

28.     In sum, applicants who are 40 or older are disadvantaged and disfavored at each stage of the selection process described above (as compared to applicants under 40), including by receiving lower scores from interviewers (including Googleyness scores), by being disfavored by individual hiring committee members, by receiving lower hiring committee grades, and by being disfavored by the Directors and Senior Vice Presidents who must affirm any hiring decision. This is so despite the older applicants being equally or better qualified than younger applicants. As a result, applicants age 40 or older are rejected at a statistically significant rate compared to applicants under 40. In other words, Google's interview and hiring policies, are intentionally discriminatory and, even if found to be facially neutral, result in a disparate impact on older applicants. Google's employment demographic data reflects this discrimination – while the median age of computer workers in the United States was over 40 years of age as of 2016, the median age of Google's workforce is 29.

*Plaintiff Heath*

29.     Mr. Heath graduated from North Carolina State University in 1978 with a B.S. in Computer Science.  Since 1978, Mr. Heath has had extensive work experience in information technology ("IT") positions, including software engineer positions with IBM, Compaq and General Dynamics.

30.     In February 2011, Mr. Heath was seeking an IT job. He had his resume posted on his personal website (www.bobheath.com). The resume listed his IT jobs dating back to 1978 (*i.e.* over 32 years of post-college jobs), and thus made it apparent he was over 50 years old.

31.     Mr. Heath's website resume stated his desired position involved "opportunities related to software development [and] I would be interested in assignments related to embedded systems or the world wide web and internet assignments regarding C++, Java, PHP, and other software technologies."

32.     Mr. Heath's resume stated he had a master certification in Java, and he had "[s]cored higher than 96% of all previous test takers" for that certification.  His resume further stated he had a master certification in C++, and he had "[s]cored higher than 89% of all previous test takers" for that certification.  It is rare for an IT professional to have both certifications in Java and C++.

33.     On February 2, 2011, Mr. Heath was contacted by Sam Chun, who worked as a recruiter in Engineering Staffing for Google in the San Francisco Bay Area (on information and belief, in Google's Mountain View, CA headquarters). Mr. Chun sent Mr. Heath an electronic message via Mr. Heath's website.  The message stated, in pertinent part:

> Not sure if you are aware of this but Google is embarking on its largest recruiting / hiring campaign in its history.  With that said I  am currently looking for the most talented and brightest software  engineers and I was hoping to get a few moments of your time to speak with you about the opportunities we have available at Google. We're specifically looking for engineers with coding expertise in C/C++ or Java for projects related to Chrome OS, Android, Gmail, Search Quality, Adsense, core Google Infrastructure, as well as many other others.  After reviewing your experience, I thought you would be a great candidate to come work at Google and add value.

34.     Google also informed Mr. Heath that we was being considered for positions in Mountain View, as well as elsewhere.

35.     Later on February 2, 2011, Mr. Heath emailed Mr. Chun in response and stated "Sure, I would be interested in working for Google."  Mr. Heath further stated "As you can see [from his attached resume], I have over 30 years of experience with Java, C/C++, and various assembly languages."   Mr. Heath's email then described his related experience working on various applications, systems and algorithms. Mr. Chun sent an email in reply later that day, and stated

12

"That is great to hear." Mr. Chun asked Mr. Heath to complete a questionnaire, which Mr. Heath promptly completed and emailed to Mr. Chun, along with a copy of his resume. On that questionnaire, Mr. Heath indicated that he was interested in working in Mountain View, among other locations.

36.     On February 3, 2011, Mr. Chun emailed Mr. Heath and informed him "a technical phone interview" of Mr. Heath, to be conducted by a "Google Software Engineer," was scheduled for Tuesday, February 8, 2011 at 10:00 AM PST.  The email indicated the Software Engineer would call Mr. Heath, and "[t]he interview requires you to be at a computer with internet connection throughout the call in case coding is tested in real time via shared document." The email gave Mr. Heath a link so he could access shared documentation via Google Docs.

37.     On February 8, 2011, the Google interviewer began the interview by calling Mr. Heath ten minutes later than scheduled.  This in turn caused the interview to be shorter than the allotted time, and to end before the interview questions were all answered, because, according to the interviewer, he had to terminate the interview at 11:00 AM PST.

38.     The Google interviewer was barely fluent in English. The interviewer used a speaker phone that did not function well. Mr. Heath asked him, politely and repeatedly, if he would use his phone's handset, and the interviewer refused, stating that "we" would have to "suffer" through the interview using the speaker phone because he did not want to have to hold the handset through the whole interview.  Communication was very difficult, and Mr. Heath and the interviewer had difficulties understanding each other throughout the interview.

39.     The Google interviewer began by asking Mr. Heath how his employment would help Google.  Mr. Heath began to answer, but before he finished, the interviewer interrupted him and

told him he had answered the question. During the remainder of the interview, the interviewer never asked about Mr. Heath's background, accomplishments, or qualifications.

40.     The remainder of the interview consisted of three sections of technical questions.  The first two sections of questions dealt with calculating the size requirements of a program using arrays and the order of complexity of a sort algorithm. Mr. Heath answered these questions completely and accurately.

41.     The third section of questions involved Mr. Heath writing a short program to find the answer to a problem presented by the interviewer. Mr. Heath arrived at a solution, and asked the interviewer if he would access Mr. Heath's solution — *i.e.* the coding and program Mr. Heath had written — via the shared Google Docs documentation.

42.     The Google interviewer refused to use Google Docs or access the shared documentation with Mr. Heath's program.  Mr. Heath offered to email the interviewer the program, and interviewer refused that as well.  The interviewer required Mr. Heath to read the program coding over the phone, which Mr. Heath did. However, the interviewer — whose poor English and use of the speaker phone further complicated this exchange — seemed not to understand what Mr. Heath was reading, despite Mr. Heath's best efforts.

43.     On February 10, 2011, Mr. Chun emailed Mr. Heath and stated "Unfortunately, based on the feedback we received from the engineer who conducted your technical phone interview, we're not going to be continuing on to the next step in the process." No detail was stated as to why Google did not hire Mr. Heath for the position. On information and belief, Mr. Chun, along with other Google representatives located in California, were involved with the decision to not offer Mr. Heath a position. On information and belief, the phone interviewer who interviewed Mr. Heath

had worked in California for Google and his input, and/or the input of Google representatives senior to him who were located in California, contributed to the decision not to hire Mr. Heath.

44.     Following the interview, Mr. Heath contacted Google Human Resources ("HR") and explained what had occurred during the interview to an HR representative. The HR representative stated that the interviewer had acted inappropriately. The HR representative stated the interviewer should have used the Google Docs software to receive the program that he had asked Mr. Heath to write.

45.     On information and belief, by conducting the interview as described above, Google intentionally did not allow Mr. Heath to communicate or demonstrate his full technical abilities and did not have a sincere interest in hiring Mr. Heath.

*Plaintiff Fillekes*

46.     Ms. Fillekes started programming as a high school student in 1976. She attended Cornell University, where she earned a B.S. in engineering in 1982. In 1990, she earned a PhD in geophysics from the University of Chicago. In 1993, she served as the Mary I. Bunting Science Scholars Postdoctoral Fellow at Harvard University. She has approximately 40 years of programing experience in a variety of programming languages (including Pascal, Basic, PL1, C, C++, and Python), and specializes in Unix and Linux systems programming.

47.     In 2007, a Google recruiter contacted Ms. Fillekes for possible employment in either Google's Engineering and Testing group, or Google's Software Development group. After performing well during a series of telephone interviews, Google invited Ms. Fillekes for an in-person interview in Mountain View. After the interview, the Google recruiter told Ms. Fillekes that she had performed very well and that her application would be submitted to Google's centralized hiring committee in Mountain View. However, Ms. Fillekes did not hear from Google

for several months. When she ultimately reached out to Google, she was told that she had not been selected.

48.     In April 2010, Steven Norton, a California-based Google recruiter, contacted Ms. Fillekes. Mr. Norton informed Ms. Fillekes that "we are now hiring for hundreds of openings this year" and asked whether she was interested in applying. Mr. Norton was aware that Ms. Fillekes had previously applied for a position with Google and stated that "I can tell by your profile on linkedin and your previous interview scores, you are an ideal candidate!" Ms. Fillekes responded that she was interested. On April 8, 2010, Ms. Fillekes interviewed with Mr. Norton and another recruiter, Neha Chaudary.

49.     After performing well, Ms. Fillekes was asked to participate in a second phone interview. On April 19, 2010, she participated in a technical phone interview with Ernest Lam. Later that day, Mr. Norton told Ms. Fillekes that "I am happy to inform you that you did great on your interview."

50.     Mr. Norton handed Ms. Fillekes' application off to Karen Cutler, a Google Software Engineering Recruiter responsible for coordinating Ms. Fillekes' next round of interviews. As requested, Ms. Fillekes sent Ms. Cutler her resume. However, Ms. Cutler was dissatisfied and sought additional information, asking "can you please send me an updated resume that shows your graduation dates for each degree." When Ms. Fillekes asked why she needed to put her graduation dates on her resume, Ms. Cutler responded "so the interviewers can see how old you are." Ms. Fillekes provided her with this information.

51.     On May 10, 2010, Ms. Fillekes attended an in-person interview in Mountain View and met with a number of Google representatives. Ms. Fillekes performed well during these interviews and was told that her application would be reviewed by Google's hiring committee. On May 17,

2010, Ms. Cutler emailed Ms. Fillekes to inform her that after review by Google's hiring committee, she had not been selected.

52.     On August 30, 2011, Google recruiter Svetlana Sladkova contacted Ms. Fillekes about a position as a Site Reliability Engineering ("SRE") Systems Engineer on the Google.com (SRE) team. As Ms. Sladkova noted, Ms. Fillekes' "Linux expertise may be an excellent fit for our Google.com team." After performing well during several phone interviews with Google technical recruiters and a member of the SRE team, Ms. Fillekes was invited for an on-site interview.

53.     On November 29, 2011, Ms. Fillekes attended in-person interviews in Mountain View and met with a number of Google representatives, including Gary Arneson. Ms. Fillekes performed well during these interviews and was told that her application would be reviewed by Google's hiring committee. However, on December 8, 2011, Mr. Arneson informed Ms. Fillekes that after review by Google's hiring committee, she had not been selected.

54.     On December 13, 2013, Google recruiter John Wilson contacted Ms. Fillekes about another job opportunity at Google. Ms. Fillekes expressed interest and, on March 14, 2014, she was interviewed by phone by Google recruiter Mawulom Nenonene. In mid-June 2014, Ms. Fillekes participated in a second interview with Google recruiter Emily Mao. After performing well during these screening interviews, Ms. Fillekes participated in a technical phone interview on July 16, 2014. After the results of the technical interview were reviewed by Google's hiring committee, Ms. Fillekes was invited for in-person interviews.

55.     On August 24, 2014, Ms. Fillekes attended in-person interviews at Google's New York City offices, and met with a number of Google representatives. Ms. Fillekes performed well during these interviews and was told that her application would be reviewed by Google's hiring

committee. However, on August 29, 2014, Kevin Pierpont, a Google Technical recruiter, informed Ms. Fillekes that after review by Google's hiring committee, she had not been selected.  Despite being very well qualified for each of the positions she interviewed for, Google did not hire her for any position after she attended her in-person interviews.

56.     On information and belief, Google failed to hire Plaintiffs and other similarly situated individuals in favor of younger applicants under the age of 40.

*Related Actions*

57.     The EEOC has received multiple complaints of age discrimination by Google, and is currently conducting an extensive investigation into Google's employment policies and practices. As part of that investigation, the EEOC requested a copy of Google's hiring policies and related documents. Google refused to provide these documents to the EEOC and has refused to cooperate with the EEOC's investigation.

58.     In a prior lawsuit, *Reid v. Google, Inc.*, the California Supreme Court and Court of Appeal (Sixth Circuit) held that former Google executive Brian Reid (formerly Google's Director of Operations and Director of Engineering) had presented sufficient evidence in alleging age discrimination – including statistical evidence supporting preferential performance reviews and bonuses for workers under 40 and negative statements by high-level executives concerning older workers – to warrant a trial and denial of summary judgment.  *See* 235 P.3d 988 (Cal. 2010); 66 Cal. Rptr.3d 744 (Cal. Ct. App. 2007).  As those Courts' found, in addition to presenting statistical evidence, Mr. Reid presented evidence that executives and colleagues at Google  had made negative statements reflecting animus towards workers over the age of 40, including: (a) that Urs Hölzle (Google's eighth employee, former VP of Engineering, and now a senior vice president of technical infrastructure at Google) had supervised Reid and had made age-related comments to

Reid "every few weeks," including statements to Reid that his opinions and ideas were "obsolete," and "too old to matter;" (b) that other colleagues at Google had referred to Reid as an "old man," an "old guy," and an "old fuddy-duddy," had told him his knowledge was ancient, and had joked that his CD jewel case office placard should be an "LP" instead of a "CD;" (c) that Reid alleged that in a performance evaluation he received, his supervisor stated "Right or wrong, Google is simply different: Younger contributors, inexperienced first line managers, and the super fast pace are just a few examples of the environment;" (d) that Google's Vice President of Engineering Wayne Rosing (to whom Reid and Hölzle reported) and executive Larry Page (one of Google's co-founders) were involved with Reid's job termination and that Reid was told he was not a "cultural fit" as a reason for his job termination;  and (e) that a former Google recruiter testified that the term "cultural fit" was used in company circles only to describe older workers.

## ADEA COLLECTIVE ACTION ALLEGATIONS

59.     Plaintiff Fillekes brings this case as an ADEA collective action pursuant to the 29 U.S.C. 216(b), on behalf of herself and all individuals similarly situated individuals: *i.e.*, individuals who interviewed in-person for any SRE, SWE, or SysEng position with Google in the United States; were age 40 or older at the time of the interview; and were refused employment by Google; and received notice that they were refused employment on August 28, 2014 through October 5, 2016.

60.     Google has engaged in a systematic pattern and practice of discriminating against individuals (including Plaintiffs) who are age 40 and older in hiring, compensation, and other employment decisions with the resultant effect that persons age 40 or older are systemically

excluded from positions for which they are well-qualified. The end result of Google's pattern and practice of age discrimination is a workforce with a median age of 29.

61.     Google has also implemented interview and hiring policies and practices that have a disparate impact on applicants age 40 and older, such that persons age 40 or older are denied employment opportunities at a disproportionate rate, compared with applicants who are under 40 years old.

**COUNT I**
(Disparate Treatment)
(Age Discrimination in Employment Act, 29 U.S.C § 621, *et seq.*)
(On Behalf of Plaintiffs and Similarly Situated Individuals)

62.     Plaintiffs re-allege and incorporate the above paragraphs by reference as if fully set forth herein.

63.     The ADEA claims herein are brought by Plaintiffs and similarly situated individuals.

64.     Throughout the liability period, Google has engaged in a pattern and practice of discriminating against individuals who are age 40 and older by:  (a) knowingly and intentionally, in the company's hiring and employment practices, treating adversely individuals who are 40 years old and older, and treating preferentially individuals who are under 40 years old, and (b) filling a disproportionately large percentage of its workforce with individuals under 40 years old (such that the median workforce age is 29 years old) even when there are many individuals age 40 or older who are available and well-qualified for the positions at issue.

65.     As a direct and proximate result of Google's intentional discrimination, Plaintiffs and similarly situated individuals have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to positions, compensation, and/or employment with Google.

66.     Google's actions constitute unlawful discrimination in violation of the ADEA.

20

### COUNT II
(Disparate Impact)
(Age Discrimination in Employment Act, 29 U.S.C § 621, *et seq.*)
(On Behalf of Plaintiff Fillekes and Similarly Situated Individuals)

67.     Plaintiffs re-allege and incorporate the above paragraphs by reference as if fully set forth herein.

68.     The ADEA claims herein are brought by Plaintiff Fillekes and similarly situated individuals.

69.     Throughout the liability period, Google has used policies and practices related to hiring and employment described herein, that have had a disparate impact on the basis of age (discriminating against applicants that are age 40 or older in hiring) that are not job-related for the positions at issue, not consistent with business necessity, and are not based on any reasonable factor other than age.

70.     As a direct and proximate result of Google's policies and practices, Plaintiff Fillekes and similarly situated individuals have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to positions, compensation, and/or employment with Google.

71.     Google's actions constitute unlawful discrimination in violation of the ADEA.

### COUNT III
(California Fair Employment and Housing Act, Cal. Gov't Code § 12900, *et seq.*)
(On Behalf of Plaintiffs individually)

72.     Plaintiffs re-allege and incorporate the above paragraphs by reference as if fully set forth herein.

73.     The FEHA prohibits an employer from discriminating on the basis of age. Cal. Gov. Code § 12940(a). The FEHA claims herein are brought by Plaintiffs individually.

74.     Throughout the liability period, Google has engaged in a pattern and practice of discriminating against individuals who are age 40 and older by:  (a) knowingly and intentionally, in the company's hiring and employment practices, treating adversely individuals who are 40 years old and older, and treating preferentially individuals who are under 40 years old, and (b) filling a disproportionately large percentage of its workforce with individuals under 40 years old (such that the median workforce age is 29 years old) even when there are many individuals age 40 or older who are available and well-qualified for the positions at issue.

75.     As a direct and proximate result of Google's intentional discrimination, Plaintiffs have been denied employment, denied the fair opportunity to obtain employment, and denied fair opportunities with regard to positions, compensation, and/or employment with Google.

76.     Google's actions constitute unlawful discrimination in violation of the FEHA.

## JURY TRIAL DEMAND

77.      Pursuant to Fed. R. Civ. P. 38(b), Plaintiff Heath, on behalf of himself, and Plaintiff Fillekes, on behalf of herself and on behalf of others similarly situated, demand a trial by jury of all claims asserted in this Second Amended Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this Court enter judgment against Google:

a.     Declaring this action to be an ADEA collective action properly maintained under 29 U.S.C. §216(b);

b.     Designating Plaintiff Fillekes as representative of the Collective action;

c.     Designating Plaintiff Fillekes' counsel as counsel for the Collective action;

d.     Rendering a declaratory judgment that the practices complained of herein are unlawful and violate the ADEA and FEHA;

e.      Issuing a permanent injunction against Google and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

f.      Ordering Google adopt a valid, non-discriminatory method for hiring;

g.      Ordering Google post notices concerning its duty to refrain from discriminating against employees on the basis of age;

h.      Ordering Google pay Plaintiffs, and similarly situated individuals, compensatory damages for harms suffered as a result of Google's violations of the ADEA;

i.      Ordering Google pay Plaintiffs compensatory and punitive damages, attorneys' fees, and costs for harms suffered as a result of Google's violations of FEHA;

j.      Awarding Plaintiffs, and similarly situated individuals, prejudgment interest at the prevailing rate on the compensatory damages as a result of Defendant's discriminating against them;

k.      Awarding Plaintiffs, and similarly situated individuals, liquidated, exemplary and punitive damages;

l.      Awarding reasonable attorneys' fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

m.      Awarding Plaintiffs, and similarly situated individuals, such other relief as this Court deems just and appropriate.

Dated:  September 11, 2017          Respectfully submitted,

By: /s/ Daniel Low

    Daniel L. Low, SBN: 218387
    Daniel A. Kotchen (*pro hac vice*)
    Michael von Klemperer (*pro hac vice*)
    KOTCHEN & LOW LLP

    Michael F. Brown (*pro hac vice*)
    DVG LAW PARTNER LLC

    Attorneys for Plaintiff
    CHERYL FILLEKES &
    OPT-IN PLAINTIFFS


    SMITH PATTEN

    */s/ Dow W. Patten*
    DOW W. PATTEN

    Attorney for Plaintiff
    ROBERT HEATH